UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 10-32(1)(JNE)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **POSITION OF THE UNITED STATES** |
| | ) | **WITH RESPECT TO SENTENCING** |
| v. | ) | **AND MOTION FOR EVIDENTIARY** |
| | ) | **HEARING** |
| DENNIS EARL HECKER, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its undersigned counsel, hereby submits its position with respect to sentencing in the above-captioned case.  The United States asks the Court to sentence defendant Dennis Earl Hecker to a term of imprisonment of 120 months; that is, ten years, the statutory maximum sentence.

## <u>INTRODUCTION</u>

Viewed in isolation, there is nothing unique about any of the crimes--wire fraud, conspiracy, bankruptcy fraud--that Dennis Hecker committed in this case.  What is unique and most remarkable about this case, what sets Hecker apart from other defendants, is that Hecker committed each of these relatively ordinary crimes over and over and over, year after year after year.  He did not stop after being caught by Chrysler Financial in the Suzuki scheme, after being caught by Hyundai Motor in the Hyundai scheme, after being caught by the Chapter 7 trustee in a number of bankruptcy fraud schemes, after being indicted a federal grand jury, or after

pleading guilty before this very Court.  This case is set apart by a man who chose time and again to ignore the rule of law where it benefitted him and, when caught, to lie and manipulate the truth in desperate efforts to cover up his crimes. Most particularly, after seeking the protections of the U.S. bankruptcy system, a system designed to give honest debtors a fresh start, Hecker cheated that system in a multitude of ways, through nearly a dozen major bankruptcy fraud schemes all designed with the single goal of furthering Hecker's high-flying lifestyle.  Hecker also willfully ignored court orders and lied to courts where he thought it would benefit him, thus demonstrating contempt for the judicial process. As addressed further below, a ten year sentence is a fair and just sentence given the facts and circumstances of this case and this defendant.

## SUMMARY OF UNDISPUTED ISSUES

The United States has reviewed the Presentence Investigation Report ("PSR") prepared in this case and adopts the findings of the report, except as follows.  The government will abide by its plea agreement and not advocate for the PSR's findings that the defendant should receive (1) a four-level leadership role enhancement under U.S.S.G. § 3B1.1(a) (as opposed to the two-level enhancement agreed to by the parties under U.S.S.G. § 3B1.1(c)); (2) a two-level enhancement for abuse of a position of trust under U.S.S.G. § 3B1.3; and (3) a two-level enhancement for obstruction

of justice under U.S.S.G. § 3C1.1. Thus, the parties do not dispute any of these issues.

The parties also do not dispute the restitution amounts that should be ordered for Chrysler Financial ($16,261,871.91), American State Bank and Trust Company ($1,299,686.90), U.S. Bank ($1,094,593.21), North Shore Bank ($990,977.99), and Center National Bank ($403,326.45). While the parties dispute loss relating to some bankruptcy fraud schemes, they are in agreement regarding the restitution amounts attributable to the following bankruptcy fraud schemes: 2008 Land Rover ($27,940), transfers to Prohofsky ($80,000), cash ($25,603), and Equity 4 U checks and gift cards ($10,480).

## SUMMARY OF DISPUTED ISSUES

The issues in dispute are (1) whether the defendant should be denied a three-level reduction for acceptance of responsibility, (2) whether Hyundai Capital America, formerly known as Hyundai Motor Finance Corporation ("Hyundai Capital") is a victim entitled to restitution, and (3) the total amount of loss, and thus restitution the defendant should be ordered to pay, with respect to his concealment of assets in five bankruptcy fraud schemes: Northstate Financial retitled assets, transfers to Christi Rowan, club memberships, luxury watches, and Prudential life insurance.

As set forth below, the United States hereby moves for an evidentiary hearing, pursuant to L.R. 83.10(f), to prove that

Hyundai Capital is an additional victim entitled to over $10 million in losses and, if necessary, to prove the loss and restitution amounts attributable to five bankruptcy fraud schemes.[1]

## STATEMENT OF FACTS

On September 7, 2010, Hecker pled guilty to Count 1 of an Information, charging him with conspiracy to commit wire fraud with respect to the Suzuki and Hyundai schemes, in violation of 18 U.S.C. § 371.  Hecker also pled guilty to Count 22 of the Second Superseding Indictment, charging him with bankruptcy fraud, in violation of Title 18, United States Code, Section 152.  In his plea agreement, however, Hecker admitted (at p. 6), that "[a]s relevant conduct, the defendant agrees that he engaged in multiple additional acts of bankruptcy fraud, to include the conduct summarized in many of the remaining counts of Counts 16-26 of the Second Superseding Indictment."  The following facts describe Hecker's conduct in connection with the Suzuki, Hyundai, and various bankruptcy fraud schemes.

### A.   Suzuki Fraud Scheme

Hecker's crimes go back to at least 2006, when he devised the Suzuki-related scheme to defraud Chrysler Financial, his largest and most important lender.  Hecker was the mastermind behind the scheme.  He directed others to alter the Suzuki contract and to

---

[1]The parties stipulated in the plea agreement (¶ 5.c) that the loss amount exceeds $20 million but is less than $50 million. Thus, these issues do not affect that loss amount range.

present the altered document to lenders, all as a way of keeping hundreds of thousands, and later millions, in incentive money. In his scheme, for multiple years, including at least 2006 and 2007, he lied to lenders about what it really cost him to buy Suzuki vehicles. He left his lenders under-collateralized, and he rationalized it all by hoping things would work out in the end. Meanwhile, according to many witnesses, he used each of his businesses as his own personal piggy bank, draining them of needed resources and financing his high-flying lifestyle.

Hecker also corrupted a number of others by involving them in his schemes to defraud. Some lower level employees, including some who had never worked for anyone else in the auto industry, told the government something seemed not quite right about providing their lender with an altered contract, but they just assumed that was how business was done.

Eventually, the Suzuki scheme caught up to Hecker. In early 2008, one of Hecker's employees inadvertently included a copy of the real 2008 Suzuki incentive addendum among other papers sent to Chrysler Financial. The Chrysler Financial representative was on the phone immediately with Hecker, demanding explanations. Hecker made excuses about why Chrysler Financial had not known about the 2008 Suzuki incentives previously. He promised to pay the 2008 incentives in due course. True to form, Hecker mentioned nothing about the *2007* Suzuki incentives. A few weeks later, only after

Chrysler Financial put two and two together, realized they were also likely due incentives on the 2007 Suzukis, and demanded payment, Hecker agreed to repay Chrysler Financial through a lump sum check for over $2.4 million. Meanwhile, Hecker was extremely upset with the employee who inadvertently sent the correct document, as both he and co-defendant Leach had warned employees for years not to provide it to Chrysler Financial. The employee, whom Hecker had previously involved in his Suzuki scheme, was almost fired for doing nothing more than accidentally sending a true document to Hecker's lender.

Remarkably, even after Chrysler Financial caught Hecker in the Suzuki scheme, Hecker committed the same scheme against other lenders. No longer able to hide the lucrative incentive money from Chrysler Financial, in early 2008, Hecker turned to U.S. Bank, and three smaller banks, North Shore Bank (Brookfield, Wisconsin), Center National Bank (Litchfield, Minnesota), and American State Bank and Trust Company (Williston, North Dakota), to fund the Suzuki vehicles. In each instance, Hecker or an employee acting at his direction, lied to these lenders and provided them with a similarly altered Suzuki contract that was silent about incentives. Even after the lenders began to discover that they had been lied to about the incentive issue (and the value of their collateral), Hecker and others at his direction engaged in lulling and cover-up communications with them, including falsely telling them that after

6

a certain period of time the Suzuki cars converted to "risk" cars. As a result of the fraud and the cover-up, each of these banks suffered a loss.  Carlton Financial, then a Plymouth, Minnesota company that served as the fiscal agent for the three smaller banks, has since gone out of business in large part because of Hecker's Suzuki fraud scheme.

**B.   Hyundai Fraud Scheme**

In late 2007, Hecker escalated what he had begun in the Suzuki scheme to the even more blatantly fraudulent Hyundai scheme.  With co-conspirator Leach's help, Hecker gave a cut and pasted document to Chrysler Financial, knowing full well that the document was a fake and that his underlying representations were lies.  Again, having furthered the similar Suzuki fraud for years, Hecker was unconcerned, so long as it meant he could get, and keep, over $17 million in incentive money.  The scheme worked, and Chrysler Financial funded over $80 million worth of cars believing them to have a "repurchase" guarantee when in fact they were "risk" cars with no guarantee.  In the interim, Hecker received his desired incentive money from the manufacturer, Hyundai Motor America ("Hyundai Motor"), without telling Chrysler Financial about it. The government traced some of that incentive money to personal bank accounts for Hecker.

Leach and another employee resigned over the Hyundai fraud, but Hecker continued unfazed.  In an effort to minimize the risk

7

that Chrysler Financial would ever discover the fraud, and in an attempt to try and retain Leach, Hecker arranged to refinance a portion of the fraudulent Hyundai cars with Hyundai Capital. Because Hyundai Capital is related to Hyundai Motor, Hecker could not have masked the "risk" nature of the cars.  But Hecker intentionally omitted informing Hyundai Capital that the reason he was urgently in need of refinancing the cars was because he had committed fraud against Chrysler Financial and two high-level employees had quit over the fraud.  He need to refinance the cars to help cover up the fraud.

Withholding the true information, which certainly would have affected Hyundai Capital's lending decision, Hecker, through himself and an employee, made misrepresentations to Hyundai Capital.  Hyundai Capital was told that Hecker needed to refinance the cars immediately because Chrysler Financial was having liquidity issues and had reached its limits on funding non-Chrysler vehicles.  Hyundai Capital was further told that the cars were sitting idle and could not be placed in service until they could be refinanced.

These statements were false.  In reliance on the misrepresentations, Hyundai Capital refinanced approximately 2,502 Hyundai vehicles.  See In re Dennis Hecker, United States Bankruptcy Court, District of Minnesota, Case No. 09-50779, Doc No. 186 (Hyundai Capital's Complaint for Determination of

Nondischargeability of Debts), ¶ 10 at 3. Hecker, for his part, dropped the ball on paying Hyundai Capital, and it suffered a loss exceeding $10 million.

Fast forward to approximately nine months later, October 2008, when Hecker's Hyundai fraud scheme was discovered. By that time, Hecker had defaulted on most of his loans, and Chrysler Financial called the loans. When attempting, essentially, to cash in on what it thought were Hyundai Motor's "repurchase" obligations, Chrysler Financial was told by Hyundai Motor that almost all of the cars it thought were "repurchase" were in fact "risk." Hyundai Motor took one look at the altered Hyundai contract that Hecker had supplied Chrysler Financial back in 2007, and it recognized the fraud immediately. It was, in the words of one of Hyundai Motor's high level employees, the biggest fraud they had ever seen.

True to form, Hecker was not done with his fraud scheme. Instead, when Hyundai Motor confronted him about the fraud, he and co-conspirators at his direction lied to Hyundai Motor, asserting there was no fraud and offering excuses about how there was just a mistake, that because there were so many contracts, someone had just gotten confused. Hyundai Motor did not buy the lulling explanations and attempted cover-ups, and neither did Chrysler Financial. The discovery of the Hyundai fraud scheme was the

beginning of the end of the Hecker empire, although Hecker's fraud was far from over.[2]

Within a few months after the Hyundai fraud scheme was discovered, in December 2008, Hecker placed one of his companies, Advantage Rent A Car company, in bankruptcy. Advantage had leased all the fraudulent Hyundai (and other) vehicles. At the time, Advantage had approximately 558 payroll employees, as Hecker had greatly reduced its employees in the months leading up to the bankruptcy filing.

By late 2008, Hecker began to contemplate personal bankruptcy as well. Not only did Hecker owe millions to Chrysler Financial and to his other lenders, but he was being barraged by calls from consumers who had purchased vehicles from his auto dealerships. In many instances, Hecker declined to pay the purchasers' tax, title, and license amounts over to the state, despite his legal obligation to do so and despite that the purchasers, or their lenders, had

---

[2]After filing bankruptcy, Hecker continued to deny that he engaged in the Hyundai fraud, and he engaged in obstructive tactics in doing so. Based on Hecker's excessive failure to abide by bankruptcy court discovery and other orders, the bankruptcy court took the rather exceptional step of summarily concluding that Hecker's entire debt to Chrysler Financial, over $83 million, was not dischargeable in bankruptcy. In re Dennis Hecker, United States Bankruptcy Court, District of Minnesota, Case No. 09-50779, Doc. 401.

originally paid these amounts to Hecker's dealerships in trust, assuming they would be paid over to the state.[3]

### C.   Bankruptcy Fraud Schemes

By early 2009, with personal bankruptcy looming, Hecker embarked on a series of bankruptcy fraud-related schemes.  Because Hecker had personally guaranteed the vast majority of loans taken out by his business entities, he knew that his creditors could come after his personal assets.   Thus, Hecker set out to hide those assets from the bankruptcy court and his creditors in a myriad of ways.

### 1.   Hidden Cash

Among many other schemes, Hecker arranged, with others' help, to hide his large amounts of cash.  On his June 4, 2009, bankruptcy petition, Hecker disclosed the total sum of $5,500 in cash. Hecker, of course, had thousands more, as demonstrated by the more than $25,000 that the government found in his home and office just a few weeks later, during June 17 search warrants.  Witnesses told the government that they assisted Hecker in hiding large amounts of cash before Hecker filed bankruptcy.

---

[3]In a number of instances, the State of Minnesota obtained sales tax monies by filing claims against the bond companies which insured the Hecker dealerships.  In some cases, the State of Minnesota filed claims which exceeded the amount allowed by the bond companies; thus the State of Minnesota did not receive any tax, title, and license fees for those claims.

## 2.   Northstate Financial Retitling Scheme

With the help of James Gustafson and others, in the weeks and months before filing bankruptcy, Hecker arranged to retitle a number of personal assets, including a Cadillac Escalade, into the name of one of his many inactive companies, Northstate Financial. When Hecker filed his bankruptcy schedules on July 1, 2009, Hecker disclosed that Northstate Financial had approximately $150,000 worth of assets (which he did not describe further), which were being held by that entity for resale.   None of that was true. Northstate Financial was a shell company that had never held assets for resale and which, by the start of this scheme in early 2009, had long since ceased any operations.   Even when it was operational, Northstate's business was in floor plan financing. That is, it was a lender, not a seller or holder of assets.

Moreover, the assets retitled in Northstate's name were Hecker's personally.   They included a Malibu Wakesetter boat, two Cobalt boats, several Harley Davidson motorcycles, and a Mitsubishi Eclipse.   These assets were, in the words of several witnesses, Hecker's "toys"; they were not "held for resale."

In his letter to U.S. Probation regarding the PSR, Hecker contends that the Cadillac Escalade was the only asset that he intended to conceal from lenders.   Conveniently, the Escalade is the only asset expressly made a part of Gustafson's plea to similar conduct.   Gustafson (and other witnesses), however, told the

government that the scheme pertained to all of the re-titled assets, not just the Escalade. And there is no reason to isolate the Escalade from all of the other Hecker toys that he sought, at the same approximate time, to retitle in a dormant company's name.

### 3.   Land Rover in Rowan's Name

Hecker concealed another large asset, a 2008 Land Rover, through a scheme that involved his girlfriend and a defendant in a related case, Christi Rowan. In April 2009, Hecker wanted to drive the luxury vehicle, but he was in the midst of preparing to file bankruptcy. He concocted a quick scheme to have Rowan purchase the vehicle in her name. (Rowan, for her part, greatly inflated her income and said she was an attorney in order to acquire the vehicle.) Rowan acquired the vehicle for Hecker, and Hecker paid for it.

### 4.   Transfers to Rowan

The government contends that the Land Rover scheme was not the only asset-concealment scheme Hecker arranged with Rowan. Hecker also made substantial transfers of cash and checks to Rowan, over $425,000, in the year before his bankruptcy filing. He only disclosed approximately $118,500 in transfers. The difference, $306,500, is, in the government's view, evidence of Hecker's fraudulent intent. Hecker objects, and claims unpersuasively that his transfers to Rowan were not "material or intentional."

13

### 5.   Hidden Luxury Watches

Hecker's watch scheme is a vivid example of Hecker's refusal to stop committing fraud, even when caught repeatedly engaged in the scheme.  In his initial bankruptcy schedules, Hecker disclosed some of the many luxury watches he owned.  According to multiple witnesses, including one who helped Hecker in the scheme, Hecker hid an even larger number of other watches because he could not bear to part with them.  Hecker, however, did not count on the Chapter 7 trustee, Randy Seaver, discovering a number of these watches from reviewing Hecker's old insurance documents.  Hecker also apparently did not realize that government investigators had photographed and inventoried a number of watches, found in a safe in Hecker's office, during search warrants on June 17, 2009.  The watches were left behind and thus in Hecker's possession, but Hecker declined to disclose them on his schedules.

After the trustee sued Hecker for concealing the watches listed on Hecker's insurance documents, Hecker filed an amended bankruptcy schedule, identifying a few additional watches, including some, but not all, of the watches that the government had inventoried during its prior search warrants.  Thus, for the second time, Hecker had handpicked some watches to disclose and turn over to the trustee, while concealing the remaining watches, with hopes that he could retain them for himself.

14

In the months that followed, more concealed watches were discovered and turned over to the trustee or the government. In March 2010, Hecker was caught having hidden a number of watches in a satchel that was buried in a file cabinet in the offices of one of his lawyers, William Skolnick. When confronted, Hecker secretly "stole" the satchel of watches back. Skolnick and his counsel promptly demanded that Hecker turn the watches over to the government. Hecker, through criminal counsel William Mauzy, turned over the satchel, along with 15 watches. Still, however, Hecker did not turn over all of the watches that he had hidden in Skolnick's office.

One such watch was a luxury white Chanel watch. In separate interviews with the government, two of Skolnick's employees specifically recalled seeing a white Chanel watch among the hidden watches they had discovered. Between the time Hecker "stole" the watches back and the time the satchel was turned over to the government, the Chanel watch was removed from the satchel. The Chanel watch has yet to be recovered.

Also in March 2010, six more hidden watches were recovered by the government after it interviewed a witness who stated that, just before bankruptcy, Hecker asked him to hold the watches.

In April 2010, the government recovered nine more watches, after discovering that Hecker concealed these nine watches by stashing them with friends at Royal Jewelers in Fargo, North

Dakota.   These Royal Jewelers watches provide perhaps the most dramatic example of Hecker's brazen fraud.   The sequence of events was as follows.   Hecker was indicted in this case on February 10, 2010.   Nine days later, the trustee conducted a Rule 2004 bankruptcy examination (basically, a deposition) of Hecker.   During the examination, the trustee showed Hecker some search warrant photographs of still-unrecovered watches and asked Hecker where they were.   Hecker asserted the Fifth Amendment.   The trustee further advised Hecker that if he still had the watches, he was to do nothing with them.   Despite these specific warnings, within the next week, Hecker delivered nine of the watches, in the same black bag pictured in the search warrant photographs, to Richard Olson, Hecker's friend and the owner of Royal Jewelers.   In April, Olson came forward, disclosed the watches, and turned them over to an IRS agent in Fargo.

Later, in July 2010, Hecker's lawyer Barbara May turned over four additional watches to the trustee.

The majority of the watches Hecker tried to conceal have now been sold by the trustee.   The sale amount represents a reasonable estimate of the loss amount with respect to the watch scheme.   The government, however, cannot reasonably estimate the loss with respect to watches that remain concealed to this day.   Thus, the loss pertaining to the luxury watches is necessarily an underestimate.

### 6.   Prohofsky Bank Account

As mentioned, Hecker's mode of operation includes his corruption of others through recruiting them to assist in his schemes.  Perhaps the most striking example of this corruption is Hecker's enlistment of his former father-in-law, William Prohofsky. Prohofsky was married to the mother of Hecker's ex-wife, Tamitha Hecker.  Prohofsky became close to Hecker, and he sought to help Hecker when Hecker's businesses were collapsing.  With no history of any criminal activity, Prohofsky agreed at Hecker's direction to do a number of things.  Starting in about May 2009, in the weeks before Hecker filed bankruptcy, Hecker had Prohofsky place approximately $80,000 worth of checks and wire transfers into Prohofsky's bank account, for the purpose of hiding the money from the bankruptcy trustee.  Hecker then had Prohofsky write out various checks from the accounts, to pay for things Hecker wanted paid for, including Breck School tuition, golf club memberships, $14,800 to Rowan, and association dues on Hecker's luxury home in Medina.[4]  Of course, Hecker did not disclose the transfers to Prohofsky on his bankruptcy schedules.  Hecker wanted it to appear as if the money was Prohofsky's, and that Prohofsky was just

---

[4]Three checks were issued to Prudential Insurance for life insurance premiums.  These policies would later become the subject of another Hecker scheme, as discussed below.  Hecker used the Prohofsky account to hide these checks.

helping Hecker out by voluntarily paying $80,000 in expenses for Hecker.

### 7.   Prohofsky Gift Cards

In a related scheme, Hecker directed Prohofsky to purchase a number of gift cards, using the money that Hecker had transferred to Hecker's account.   Prohofsky bought 20 gift cards for a total amount of $10,000.   Prohofsky then gave the gift cards to Hecker, who used them for his own benefit, all to hide the underlying money and subsequent purchases from the trustee.

As with the luxury watches, Hecker apparently did not realize these gift cards were inventoried and left on the scene during the execution of the search warrants on June 17, 2009.   Thus, the government has irrefutable evidence that these gift cards were in Hecker's possession at the time of the warrant.   Again, as with the watches, Hecker deliberately failed to list the gift cards on his bankruptcy schedules.

### 8.   Equity 4 U Gift Cards

Hecker also engaged in a gift card scheme similar to the Prohofsky gift card scheme, but without any apparent involvement by Prohofsky.   Just prior to bankruptcy, Hecker converted approximately $10,480 that his companies had received from Equity 4 U, a company that provided warranty claim coverage for vehicle purchasers, into gift cards.   Later, after he was already in bankruptcy, Hecker spent the money on the gift cards to make a

number of luxury purchases, all to further a lifestyle inconsistent with someone who was asking the bankruptcy court to discharge his debts.

### 9.   Fraudulent Leases

Prohofsky was also involved in assisting Hecker with a fraudulent lease scheme.  Despite filing bankruptcy, Hecker had no desire to part with his luxury properties in Cross Lake, Minnesota. Hecker arranged for Prohofsky, another relative, and a cohort to sign "leases" for two of the properties, to make it appear as if they were each living at the houses full time, paying rent to Hecker.  None of this was true.  While some of them did use the properties from time to time, they actually lived elsewhere, and no rent was ever paid (or intended to be paid).  At various points, Hecker and others lied about the purported leases to the bankruptcy trustee and prepared false rent checks, all in an effort to keep the scheme from being discovered.  Hecker embarked on a similar fraudulent lease scheme with Rowan, in which he tried to make it look like Rowan was a tenant renting the Medina home, despite that they lived there together and Hecker paid the expenses. Ultimately, there is no loss related to any of the false leases because the properties all had significant mortgages.  The Court can nonetheless consider the scheme when evaluating Hecker's sentence.

## 10.  Children's Trust Funds

Hecker further corrupted Prohofsky by assigning him to serve as trustee for a number of trusts Hecker had set up in the names of his children, for the sole purpose of enabling Hecker to steal money from the trusts.  In late 2009, Prohofsky agreed at Hecker's request to become the trustee for the trusts, so that Hecker could immediately drain the trusts and use the money for himself.  Hecker turned the trust money over to his bankruptcy counsel, who in turn gave the money to the bankruptcy trustee as part of a settlement that allowed Hecker and Rowan to keep the Medina home.  Without regard to how atrocious it was to steal from his own children, Hecker participated in a series of misrepresentations to the bankruptcy trustee with respect to the trust monies.  The trustee was led to believe that the source of the funds for the house settlement was Hecker's friend Ralph Thomas, when in fact, the money came from raiding the children's trust funds.  See  In re Dennis Hecker, United States Bankruptcy Court, District of Minnesota, Case No. 09-50779, Doc. No. 426 (Letter dated March 18, 2010, from Matthew Burton to Judge Kressel).

On March 3, 2010, Prohofsky shot himself one day after speaking with federal investigators in this case.  See Doc. No. 43 (Prohofsky safe deposit box search warrant).  While hospitalized for wounds from which he later died, police found a note from Prohofsky referencing his prior meeting with investigators and

indicating that he intended to help authorities.  Id.  From this profoundly sad turn of events, it is fair to conclude that Prohofsky felt extreme remorse for his role in Hecker's fraud and that he and his family have suffered greatly for that role.

### 11.  Hidden Club Memberships

Although Hecker disclosed some of his golf and other memberships on his bankruptcy schedules, he declined to disclose a number of others.  These included Golf Club Scottsdale (Arizona), Roaring Fork Club and Roaring Fork Mountain Club (Colorado), Spring Hill Golf Club (Wayzata, Minnesota), and Timbers Club Snowmass Village (Colorado).  Before he filed bankruptcy, he or employees contacted the clubs to inquire about selling his memberships.  In addition, after filing bankruptcy, Hecker had communications with a number of these clubs, and arranged for dues to be paid on a few, thus demonstrating that he was aware that he had these membership interests, despite his decision not to disclose them.

Additionally, after the memberships were discovered by the trustee, who then put the memberships up for sale, Hecker provided information regarding the values of these clubs to his friend, Ralph Thomas.  Hecker's plan was to have Ralph Thomas purchase the memberships and other items of value from the bankruptcy trustee, sell them for a profit, and split the profits with Hecker. Although the plan did not go forward, by approaching Thomas with the plan, Hecker acknowledged the memberships' cash value.

## 12.  Violation of CJA Appointment Order

By March 2010, Hecker had already been indicted and had been released on restrictive conditions, including GPS monitoring with a curfew, and travel restricted to the State of Minnesota.  On April 14, 2010, Hecker's private counsel withdrew, and Hecker represented under oath that he lacked the funds with which to pay private counsel.  In response to questions from then-Magistrate Judge Nelson, Hecker represented that he had no assets and that there were no assets that he had not already disclosed to the bankruptcy court.  She appointed a CJA panel attorney, with the warning, orally and in writing, that if it was later determined that Hecker had assets, he would be required to pay for his CJA-appointed counsel.  Doc. No. 78 (Order) at 5.  After that hearing, not only did Hecker ignore Magistrate Judge Nelson's order and ignore his conditions of release, he committed new crimes of bankruptcy fraud and wire fraud.  See Mem. of Law & Order (Doc. No. 219); Mem. of Law & order (Doc. No. 253).[5]

Hecker was later reminded of the requirement that he repay the CJA fund during his change of plea hearing before this Court.  In addition, on September 15, 2010, about a week after his guilty

---

[5]In addition to violating the CJA order, Hecker violated a number of orders in both the bankruptcy court and family court proceedings.  In the latter, in late March 2010, Hecker was jailed for several days for his contempt of court for failing to pay $10,000 in alimony to his second wife and for withholding key financial data in the divorce from his fourth wife.

plea, Hecker received a copy of a letter the trustee had written to the Federal Defender stating that Hecker would be receiving bankruptcy settlement monies and advising that these funds should be paid over to the CJA fund.  Later, during court hearings before Chief Judge Davis, Hecker was confronted with his failure to repay the CJA fund, and Hecker insisted that he did not know how much he was supposed to pay; therefore, he paid nothing and did nothing about it.  October 18 Motion Hrg. Tr. at 72-75.

### 13.  Theft of Prudential Proceeds

In Hecker's original bankruptcy schedules, filed on July 1, 2009, he listed several Prudential life insurance policies that were in his name, thus acknowledging that they were estate assets. For one of the particular policies, one having a cash surrender value of $12,000, Hecker claimed an exemption up to $8,400, the maximum amount allowed by bankruptcy law.  When Hecker's claimed $8,400 exemption became final, that amount, in the one policy, ceased to be property of the estate.  See Schwab v. Reilly, 130 S. Ct. 2652 (2010).  The remaining Prudential policies became the property of the bankruptcy estate.

In early June 2010, Hecker applied to Prudential for an insurance policy loan with respect to one of the policies listed on his bankruptcy schedules.  In response, Prudential sent Hecker a check for $30,000.  Hecker intentionally hid this money from the bankruptcy trustee by depositing it into a newly-opened account

23

under the business name "JDS Family Holdings LLC."  He then wrote several checks on account, including a check to the Lafayette Club for $4,500 and to Wayzata Country Club for $1,275.  The transactions, however, caused the bank concern, and it closed the account and returned the $30,000 to Hecker.

On July 16, 2010, the trustee discovered the $30,000 in concealed funds belonging to the estate and immediately demanded that they be paid to the estate.  Hecker repaid the funds, thus tacitly conceding that the funds were assets of the estate to which he was not entitled.  Hecker's bankruptcy counsel (Barbara May) suggested in a July 16, 2010, email to the trustee that Hecker's receipt of the $30,000 was innocent, based on an explanation that the Prudential policy "lapsed and died 6 months prior to the bankruptcy filing.  Apparently, the insurance company sent Denny a check for the proceeds which he thought were lost."  The problem is, this purported explanation is false.  The true reason Hecker received the $30,000 in insurance proceeds is because in early June 2010, Hecker signed and had delivered to Prudential a $30,000 insurance policy loan request.  That is, Hecker did not inadvertently receive insurance proceeds for a policy he thought had been lost; he affirmatively contacted the insurance company to

request a loan on a policy he had previously listed on his bankruptcy schedules.[6]

To answer any lingering question about Hecker's intent, Hecker engaged in further concealment of Prudential proceeds.  That is, even after being caught stealing $30,000 from the bankruptcy estate, Hecker said nothing about having also received in the same June 2010 time frame an additional $124,000 in Prudential insurance proceeds through four separate checks.  Hecker had previously cashed these Prudential checks at "Your Exchange," a check-cashing business that makes it easy to engage in anonymous financial transactions.  Hecker paid over $3,700 in fees to Your Exchange to cash the Prudential checks.

Hecker eventually acknowledged the theft of the additional $124,000, but, as usual, only after the trustee learned of it through his investigation and demanded its return.  Later, the investigation by the trustee and the government revealed that Hecker had used the stolen insurance money to continue to fund his extravagant lifestyle, all while claiming to need a publicly-

---

[6]Hecker later claimed that his bankruptcy counsel advised him that he could keep the insurance proceeds if the trustee had not somehow claimed those monies by the end of the year.  October 20 Motion Hrg. Tr. at 63.  The government disputes this account.  As Hecker was aware, his bankruptcy counsel had asked the trustee about the insurance policies, asking the trustee if he would abandon them if they had no value.  The trustee asked Hecker's counsel to get back to him demonstrating the lack of value, but Hecker's counsel never did.  See 12/9/10 Rule 2004 examination of Hecker, at 37.  As it later turned out, the policies had substantial value.

appointed lawyer.  Hecker has yet to pay the trustee back for much of the $124,000 that he stole.

### 14.  Lies to Kia Dealer and this Court

In the weeks before his guilty plea in this case, Hecker also committed wire fraud with respect to a Kia lease application. Later, at the plea hearing itself, Hecker would lie to this Court in an apparent attempt to explain away his fraud.

In June 2010, Hecker applied for financing for a Kia vehicle from Kia Motors Finance, and leased the vehicle through Saint Cloud Auto Center, LLC ("Kia of St. Cloud").  Likely in an effort to keep the trustee from learning about it, Hecker leased the vehicle through New Dimension Advisors LLC, a shell company that he created following his bankruptcy and which he stated was in the business of "consulting."  In fact, and as Hecker would later admit during testimony before Chief Judge Davis, New Dimension Advisors had no business operations.  It was nothing more than a mechanism by which Hecker transferred money through bank accounts to pay his personal expenses.

Nonetheless, the defendant represented, via telephone, to a representative of Kia of St. Cloud that his income via New Dimensions Advisors ranged from $5,000 to $40,000 per month, and he directed the representative to list $10,000 per month as an average

income on the finance application.[7]  Kia of St. Cloud, and Kia Finance, relied on this false information when issuing the lease.

At Hecker's guilty plea hearing in this case, on September 7, 2010, Hecker and his counsel argued that there was nothing fraudulent about Hecker's representations to the Kia dealer.  At the outset, Hecker claimed he represented to the dealer that his income was $1,000 to $4,000 per month.  Plea Hrg. Tr. at 42.  These amounts were contradicted by the Kia dealer's information, but even if Hecker is given the benefit of the doubt on the exact amounts, it makes no difference.  Hecker's fraud was in misleading the dealer into thinking he had substantial monthly income, whether individually, through a consulting company or otherwise.  As Hecker testified at the guilty plea hearing, he believed his representation was accurate because he had received a lump sum amount in December 2009, which, if spread out over several months, would equal $1,000 to $4,000 per month.  Id. at 43.  Hecker, however, had long since spent the lump sum money he had received, which is why he apparently could no longer afford private counsel. See October 20, 2010, Motion Hrg. Tr. at 78 (Hecker testified that he had spent most of $200,000 received in December 2009 in a relatively short time period, including on such things as Lafayette

---

[7]In another example of using others to further his fraud, Hecker's lease paperwork also listed a co-signer, Hecker's personal physician and friend.  The paperwork claimed this individual worked for New Dimension Advisors, when in fact he had no connection to the non-operational company.

Club, Minneapolis Club, Spring Hill Golf Club, Breck School, Manny's Steakhouse, and Christi Rowan).

Hecker's fraud, perpetrated not only against the dealer but also this Court, is clear.[8]  He told a car dealer that he had significant monthly income when in fact he had long since spent all the money.  The lies were material because the Kia dealer would in no event have agreed to finance a car based on money that Hecker had already spent.

### 15.  Perjury Before Chief Judge Davis

Hecker's crimes continued not only following his indictment but also following his guilty plea, when Hecker committed perjury by lying to a second federal judge.[9]  On October 18, 2010, in a hearing before Chief Judge Davis with respect to his motion to substitute counsel, Hecker testified that in the summer of 2010, he received approximately $33,000 from an acquaintance, John Prosser,

---

[8]As further evidence of his perjury, when the Kia issue came up during the October 20 hearing before Chief Judge Davis, Hecker first tried to suggest there was no fraud because the Kia dealer "did not ask if the money was spent."  Hecker then shifted his story to suggesting that his representations were accurate because he was expecting to get additional revenue from a personal services contract he was litigating in bankruptcy court. October 20 Motion Hrg. Tr. at 86-87.

[9]Hecker also violated his release conditions throughout this case in a number of significant respects, including the Prudential insurance theft and the perjury.  He also failed to obtain prior approval from U.S. Pretrial Services before obtaining--and spending--$65,000 in money that he acquired after pleading guilty.  See Mem. of Law & order (Doc. No. 253).

who sold Hecker's Toyota Tundra at an auction.  October 18, 2010, Motion Hrg. Tr. at 57-58.   The government found this incredible, based on the value of the Tundra, and asked Hecker if he was sure that he did not receive extra money for something else.  Hecker responded that Prosser "took it to the auction and he told me he sold it for $33,000." Id. at 58.  In a proffer with the government on October 19, Hecker sought to clarify that he had also received $7,000 from Prosser in a side deal relating to the sale of another vehicle, a Cadillac Escalade.  See Letter from the government to Chief Judge Davis, dated October 20, 2010 (Doc. No. 251-1) at 2; October 20 Motion Hrg. Tr. at 105-06.  Hecker further told the government that he split the Escalade sale profits with Prosser, despite that Hecker had no ownership interest in the Escalade. Id.

Chief Judge Davis found that Hecker had committed perjury and that, based on his testimony as a whole, he had lost all credibility with the Court.  See Mem. of Law & Order (Doc. No. 219) at 5; Mem. of Law & order at 3-4 (Doc. No. 253).  In addition to the Tundra/Cadillac issue, Hecker gave various explanations about all the inaccuracies in a financial accounting that his counsel, with his assistance, had prepared and submitted to the trustee with respect to his use of the stolen insurance proceeds.  October 18 Motion Tr. at 82.  Any number of these statements could also qualify as perjury.

### 16. Hecker's Pursuit of Extravagant Lifestyle

Throughout all of the crimes in this case, a consistent theme emerged: Hecker's motive in committing his crimes was to fund his extravagant lifestyle. Even after filing bankruptcy in recognition of outstanding debts of about $767 million, and later, after declaring that he was indigent and could not afford counsel in this case, Hecker was unyielding in his pursuit of his chosen lifestyle.

Even when his companies were spiraling downward, following the discovery of the Hyundai fraud, Hecker placed his priorities squarely on furthering his lifestyle, rather than on taking care of his businesses or his employees. Witnesses indicated that from the fall of 2008, when his business was crumbling, until he filed bankruptcy in June 2009, Hecker continued to drain money from his companies to fund his lifestyle. For example, from the fall of 2008 through late spring 2009, Hecker continued to fly on private jets for personal trips, including to his Mexican condo, and he continued to provide large sums of cash to Rowan. Employees, meanwhile, were asked to go weeks without a paycheck, with Hecker making promise after promise that things would get better.[10]

---

[10] See *When Hecker's Empire Crumbled, Workers Lost More Than Their Jobs*, by Mary Jo Webster, Pioneer Press (2/7/10) (Hecker responded that he should not be held accountable for the wages owed by his businesses, asserting in an interview, "I don't have the money anyway. I'm bankrupt.") Witnesses similarly told the government that by early 2009, many employees went weeks without paychecks. When employees were let go, some never received their final paychecks at all, to say nothing of compensation for unused vacation time and other benefits they lost.

By the late spring of 2009, Hecker had reduced his staff to a select group of less than twelve employees.[11]  Although his employee roster was down to a handful of people, Hecker made sure that among this handful were two pilots whose sole purpose was to fly Hecker's private jet.  In May 2009, Hecker's company jet was repossessed by its lender.  Even after losing his jet, Hecker refused to give up his penchant to fly on private planes.  In June 2009, after Hecker filed for bankruptcy, Hecker's friend Ralph Thomas agreed to lease Hecker a private jet.  At that time, Hecker sent at least one pilot to flight training school in Florida to become certified to fly the new jet, at a cost of approximately $15,000.  Even though Hecker chose not to pay other employees and creditors, and even after declaring bankruptcy, Hecker continued to use Thomas's private jet, to pay expenses associated with the jet, and to pay pilots to fly the jet, through at least August 2009.

After filing for bankruptcy in June 2009, Hecker managed to take not one but four luxury vacations:  Hawaii (July 2009), Las Vegas (August 2009), and two trips to Aspen (Dec 2009).  While Hecker, Rowan, and their children were in Las Vegas in August 2009, they stayed at the Mirage Hotel and Casino, and their lodging bill totaled more than $7,000.  While in Aspen in December 2009, Hecker and Rowan spent approximately $32,000 to rent a luxury condo.  The

---

[11]In the end, all Hecker employees lost their jobs; during the peak of the Hecker empire, it employed between about 2,700 and 2,900 employees.

luxury expenses during these trips included a number of purchases made with the gift cards illegally obtained as part of the Equity 4 U scheme, such as $583 at Louis Vuitton (Las Vegas, August 22, 2009).   They also included purchases made with the gift cards illegally obtained as part of the Prohofsky gift card scheme, such as another $500 at Louis Vuitton (Hawaii, July 30, 2009).[12]

Following his indictment in this case, and with the use of the stolen Prudential proceeds, Hecker continued to spend thousands of dollars in a manner inconsistent with someone who had testified under oath about his purported indigence.   As Hecker's own accounting to the trustee later showed, during the summer of 2010, among various other things, he or Rowan spent money at Manny's Steakhouse ($2,750), for Dolphin Pool ($950), for Breck School ($5,000), and Wayzata Country Club ($1,200), among many others.   He also arranged, through his friend John Prosser, to obtain Cadillac, Ford, and Mercedes vehicles.   October 18 Motion Hrg. Tr. at 61.[13]

---

[12]In addition, after filing for bankruptcy in June 2009, Hecker arranged for an associate, Jim Gustafson, to set up an American Express corporate credit card in the name of Hecker's minor child.   The minor child had nothing to do with the card; Hecker used the child's name as a way to hide the fact that Hecker had a credit card.   Hecker used this credit card to fund his extravagant lifestyle, including expenses in Hawaii.   After Hecker charged in excess of $40,000 of personal expenses to the card, American Express closed the account.

[13]Hecker represented in a financial accounting that he had provided Prosser with $8,500.   What he did not mention was that the $8,500 was reimbursement to Prosser for acquiring a Harley Davidson motorcycle for Hecker, after Hecker created a fake name to bid on the motorcycle during the trustee's auction sale of

In late September 2010, following Hecker's guilty plea, Rowan attempted, with Hecker's help, to lease a Mercedes from a local dealer, but was turned down.

## ARGUMENT

### A.   Hecker Is No Longer Entitled to the Acceptance of Responsibility Reduction

The government agrees with the PSR'S finding that the defendant is no longer entitled to a three-level reduction for acceptance of responsibility, given his perjury during the September 7, 2010, guilty plea hearing before this Court as well as the October 18, 2010, hearing before Chief Judge Davis.   The defendant objects to this finding, but a court has already found probable cause to believe Hecker committed perjury.   Hecker, who bears to burden of establishing that he is entitled to the acceptance of responsibility reduction, cannot meet that burden in light of the strong evidence of perjury.

Only a defendant who "clearly demonstrates acceptance of responsibility for his offense" may receive a decrease in his offense level.   U.S.S.G. § 3E1.1(a).   A defendant who enters a guilty plea "is not entitled to an adjustment . . . [under § 3E1.1] as a matter of right."   Appl. Note 3 to U.S.S.G. § 3E1.1.   "The burden is on the defendant to establish that he is entitled to a downward adjustment for the acceptance of responsibility." United

---

former Hecker assets.

States v. Honken, 184 F.3d 961, 968 (8th Cir. 1999). Even if the defendant has entered a plea of guilty and truthfully admitted the conduct, "this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility." Appl. Note 3 to U.S.S.G. § 3E1.1.

A defendant who makes false statements at a hearing is generally not entitled to an acceptance of responsibility reduction under U.S.S.G. § 3E1.1. See, e.g., United States v. Gleason, 25 F.3d 605, 608-09 (8th Cir. 1994) (upholding district court finding that defendant lied at a suppression hearing, and thus affirming denial of acceptance of responsibility reduction); United States v. Keene, 915 F.2d 1164, 1170 (8th Cir. 1990) (finding that district court properly found that defendant had not accepted responsibility for his conduct because he testified untruthfully); see also United States v. Harrison, 431 F.3d 1007, 1013 (7th Cir. 2005) (holding that district court did not clearly err in declining to give acceptance of responsibility adjustment for defendant found to have perjured himself at trial); United States v. Williams, 408 F.3d 745, 757 (11th Cir. 2005) (finding no clear error in district court's denial of acceptance of responsibility adjustment for defendant who gave false testimony at plea hearing and sentencing hearing).[14]

_____

[14]The same facts that demonstrate Hecker has not accepted responsibility could also arguably support an obstruction of justice enhancement. To avoid even a potential argument that the

Hecker committed perjury in a hearing before Chief Judge Davis on October 18, 2010, when he testified repeatedly that he received about $30,000 solely from the sale of a Toyota Tundra:

> Q.   So when you went to sell [John Prosser of Automotive Concepts] that Toyota Tundra, he gave you the roughly $30,000?
>
> A.   Yes, he paid by check.
>
> Q.   He paid by a number of checks; is that right?
>
> A.   That's correct.
>
> Q.   There was a check for $1,000, a check for 27,670, another 1,000, another 1,000, another 1,000, another 1,000. Does that sound right? I am reading off of the trustee's filing in this matter.
>
> A.   I believe it does.
>
> Q.   And when you add [the six separate checks] up, it gets to $32,670. Is all of that for the Toyota or is some of that for something else?
>
> A.   The twenty-seven five was the check I remember. There's [also] five checks for 1,000.
>
> Q.   What were those for?
>
> A.   For the sale of the Toyota truck.
>
> Q.   Okay. So the Toyota truck was 32,670 --
>
> A.   That's correct.
>
> Q.   -- that you got back? Was that above typical retail value for that particular truck?
>
> A.   I'm not in a position to say yes or no.

---

government has gone beyond the terms of the plea agreement (an argument the government believes would fail), the government will not advocate in this case for obstruction of justice.

Q.   Well, that's your business.

A.   It was a very —- it was my business.

Q.   If others have looked that up and it seems like you
     got a pretty nice payment [for the Toyota Tundra],
     where's the extra money coming from[,] from Mr.
     Prosser of Automotive Concepts?

A.   I believe that he took it to the auction and he
     told me he sold it for $33,000.

October 18 Motion Hrg. Tr. at 57-58.

The hearing ended after 5:00 p.m. on October 18.  The next
day, at about 1:00 p.m., Hecker met with the government and said
that he needed to clarify his testimony the day before.  He stated
that he had neglected to mention that part of the $32,670 he had
received from Prosser consisted of $7,000 he received from Prosser
in a side deal relating to the sale of another vehicle, a Cadillac
Escalade.  See Letter from the government to Chief Judge Davis,
dated October 20, 2010 (Doc. No. 251-1) at 2; October 20 Motion
Hrg. Tr. at 105-06.  Hecker further told the government that he
split the Escalade sale profits with Prosser, despite that Hecker
had no ownership interest in the Escalade.  Id.  Thus, Hecker had
not in fact received the full $32,670 for the Tundra, as he
testified.  Instead, he only received about $25,670 for the Tundra,
and received $7,000 for an Escalade.  The difference in amounts is,
of course, not the point.  The point is that Hecker, in a hearing
focused on Hecker's assets, did not want to tell the court that he

36

had this side deal to split profits on a vehicle that did not even belong to him.

Chief Judge Davis found that there was probable cause to believe Hecker had committed perjury with regard to the Tundra/Escalade issue.  He further found that, based on Hecker's testimony as a whole, he had lost all credibility with the Court. See Mem. of Law & Order (Doc. No. 219) at 5; Mem. of Law & order at 3-4 (Doc. No. 253).

As further evidence of Hecker's lack of credibility, Hecker provided false information to the U.S. Probation Office, an arm of the Court.  In his initial presentence investigation interview, Hecker stated that he has "never been drunk in my life" and had no history of abusing alcohol or prescription drugs.  PSR, ¶ 74.  This information is contradicted by a number of witnesses who told the government that Hecker has long had a prescription drug abuse problem.  But even apart from the contradiction with other witnesses' statements, the information was soon contradicted by Hecker himself.  After being in jail for a time (and presumably after talking to someone about the future potential to reduce his sentence through participation in BOP's 500 Hour program), Hecker changed his story.  He submitted revised information to U.S. Probation, stating that he had in fact been abusing alcohol for some time; namely, since 2009, when it became clearer that he could not salvage his business empire.  PSR, ¶ 75.  See Appl. Note 4(H)

to U.S.S.G. § 3C1.1 (providing materially false information to a probation officer in response to a presentence investigation is an example of obstructing justice).  The government presents this information not as a way of challenging the sincerity of Hecker's revised statement admitting an alcohol problem, but as yet additional evidence of Hecker's disregard for the Court process and his willingness to lie if he feels it is to his benefit.

Because Hecker committed perjury, he cannot meet the plea agreement conditions underlying the acceptance of responsibility reduction.  The plea agreement provided the government would agree to acceptance only if:

> (i) the defendant testifies truthfully during the change of plea hearing, (ii) the defendant cooperates with the Probation Office in the pre-sentence investigation, (iii) the defendant commits no further acts inconsistent with acceptance of responsibility or this plea agreement, such as violating any federal, state, or local law, and (iv) the defendant complies with this agreement, fully identifies all assets and makes good faith efforts to make restitution to his victim.  (U.S.S.G. §3E1.1).

Hecker did not testify truthfully during the change of plea hearing, and he violated federal law by committing perjury at the October 18, 2010, hearing.  In addition, it appears that he was not forthcoming in the financial information or other information he provided to U.S. Pretrial Services/Probation.  Accordingly, although the plea agreement's guideline range was 108-135 months imprisonment, the new range, without acceptance, should be 151 to 188 months.

38

**B.    This Court Should Conclude That Hyundai Capital Is a
       Victim of Hecker's Fraud and Is Entitled to Restitution**

The parties dispute whether Hyundai Capital should be considered a victim and whether Hecker should be ordered to pay criminal restitution to Hyundai Capital.  The plea agreement did not address this matter, but the government is prepared to prove that Hecker in fact defrauded Hyundai Capital when he desperately and misleadingly sought to have Hyundai Capital refinance portions of the Hyundai fraud cars.  The government intends to prove Hyundai Capital's loss at an evidentiary hearing through agent testimony anticipated to take approximately one hour or less.

As detailed above, in late December 2007 and into early 2008, Hecker urgently sought to refinance about 2,502 of the Hyundai fraud cars through Hyundai Capital.  Hecker, through himself and an employee, lied to Hyundai Capital about the reasons why he needed to refinance so urgently, falsely representing that the vehicles were not in service and that Chrysler Financial was refusing to finance them due to internal limits on financing non-Chrysler product.  In fact, Hecker needed to refinance the cars to avoid detection of his fraud by his biggest lender, Chrysler Financial. Later, Hecker stopped paying Hyundai Capital on the financing, and it suffered a loss of approximately $10,404,029, plus approximately $2,784,718 in interest.  See Hyundai Capital America v. Dennis E. Hecker, No. 27-CV-10-20921 (Findings of Fact, Conclusions of Law,

and Order for Judgment Against Defendant Dennis E. Hecker) at ¶ 9, p. 3.

If Hyundai Capital had known the truth -- that Hecker falsified Hyundai Motor documents to finance the vehicles originally, and that he needed to refinance quickly because employees had quit over the fraud and he needed to cover it up before Chrysler Financial discovered it -- Hyundai Capital would not have provided the financing to Hecker.   Instead, as Hyundai Capital itself asserted:

> Hecker led [Hyundai Capital] to believe that Chrysler [Financial], which, up to that time had provided Hecker with fleet financing, was withdrawing from fleet financing and that Hecker urgently needed to replace his funding source.   Chrysler [Financial] had provided shorter term floor plan financing and Hecker told [Hyundai Capital] that it was time-critical that he obtain new fleet financing.

See In re Dennis Hecker, United States Bankruptcy Court, District of Minnesota, Case No. 09-50779, Doc No.  186 (Hyundai Capital's Complaint for Determination of Nondischargeability of Debts), ¶ 10 at 3.   Thus, Hyundai Capital viewed Hecker's misstatements and omissions as material.

Under relevant conduct principles, a defendant should be held responsible for all "acts and omissions committed" or "counseled, commanded, induced, procured, or willfully caused by the defendant . . . in the course of attempting to avoid detection or responsibility for [the offense of conviction]."   U.S.S.G. § 1B1.3(a)(1).  Here, Hecker's fraudulent efforts to refinance the

Hyundai fraud cars with Hyundai Capital were done at least in part in the course of attempting to avoid detection for the original Hyundai fraud perpetrated against Chrysler Financial. Accordingly, Hecker should be held responsible for the loss caused to Hyundai Capital under U.S.S.G. § 1B1.3(a)(1).

Moreover, Hyundai Capital qualifies as a victim under the Mandatory Victims Restitution Act ("MVRA"). The MVRA provides that a victim:

> means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered, including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy or pattern.

18 U.S.C. § 3663A(a)(2); see United States v. Balentine, 569 F.3d 801, 806 (8th Cir. 2009) (the purpose of the MVRA "is to make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being.").

Hyundai Capital was directly and proximately harmed when Hecker and his employee lied to it about the reasons for the urgent need for refinancing. Those acts were part and parcel of the overall fraud conspiracy. Thus, Hecker is guilty of a conspiracy to defraud both Chrysler Financial and Hyundai Capital. Both entities qualify as victims under the MVRA, and both should be named in a restitution order.

41

**C.  This Court Should Order Hecker to Pay the Full Amount of Loss Caused By His Bankruptcy Fraud Schemes**

The remaining factual disputes all pertain to approximately five bankruptcy fraud loss amounts and related matters: Northstate Financial retitled assets, transfers to Christi Rowan, club memberships, luxury watches, and Prudential life insurance.  None of these matters has any bearing on the guidelines.  The parties already agreed in the plea agreement that the loss amount, driven largely by the Hyundai and Suzuki fraud schemes, is more than $20 million but less than $50 million.  The PSR's total calculated loss relating to <u>all</u> bankruptcy fraud schemes, these five disputed areas as well as the other bankruptcy fraud areas not in dispute, is approximately $1.5 million, an amount that does not affect the parties' agreed-to loss amount range.

For purposes of the restitution order, however, the government reserves its right to present brief testimony at the evidentiary hearing, either through an agent or through the Chapter 7 trustee, with respect to the disputed bankruptcy loss issues.[15]  In proving these additional loss amounts, the government will rely upon the following authorities, among others.

"As recognized by the Guidelines, the damage wrought by fraud is sometimes difficult to calculate."  <u>United States v. Agboola</u>,

---

[15]The government understands the restitution order should state that the restitution should be made payable to the Estate of Dennis E. Hecker, c/o the Clerk of U.S. Bankruptcy Court.

417 F.3d 860, 870 (8th Cir. 2005).  For this reason, a district court is charged only with making "a reasonable estimate of the loss." United States v. Scott, 448 F.3d 1040, 1044 (8th Cir.2006) (citations omitted).  The government need only prove loss by a preponderance of the evidence.  See United States v. Boesen, 541 F.3d 838, 850 (8th Cir. 2008) (citations omitted).  The amount of the loss, however, need not be determined with precision. See, e.g., United States v. French, 46 F.3d 710, 715 (8th Cir. 1995). Because "[t]he sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence . . . [t]he court's loss determination is entitled to appropriate deference." U.S.S.G. § 2B1.1 app. n. 3(C).

As a general matter, in bankruptcy fraud matters, the value of concealed assets is often the best measure of intended loss. See United States v. Holthaus, 486 F.3d 451, 456-57 (8th Cir. 2007). Moreover, in Holthaus, the Eighth Circuit adopted the Seventh Circuit's reasoning that bankruptcy trustees qualify as victims under the MVRA if "the defendant directly and proximately harmed the bankruptcy trustee by misstating assets, which "reduced [the trustee's] compensation and increased [the trustee's] costs." Id. at 458 (quoting United States v. Lowell, 256 F.3d 463, 465-66 (7th Cir. 2001)).[16]

---

[16]In his bankruptcy action, almost certainly in recognition that his multiple acts of bankruptcy fraud had caught up to him, Hecker allowed entry of an order finding that none of his debts

## SENTENCING RECOMMENDATION

In sentencing Hecker, as with all defendants, the Court must assess the sentencing factors under 18 U.S.C. §3553(a), in addition to calculating the applicable guideline range.  The factors include the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant; the need to avoid unwarranted sentencing disparities; and the need to provide restitution to victims.  18 U.S.C. § 3553(a).  Considering all appropriate factors, a ten year prison sentence, the statutory maximum, is a fair and reasonable sentence for Hecker and would be sufficient but not greater than necessary to accomplish the federal sentencing goals in this case.

Starting with the guidelines as originally calculated by the parties, a ten year sentence falls at the approximate mid-point of that range.  Thus, in the plea agreement, Hecker anticipated the possibility of a ten year sentence.  Given Hecker's post-plea conduct that undid any prior acceptance of responsibility, a ten year sentence is below the imprisonment range the government argues is now applicable (151 to 188 months).  Ten years is well below the

---

were dischargeable.  In re Dennis Hecker, United States Bankruptcy Court, District of Minnesota, Case No. 09-50779, Doc. No. 450 (Notice of Denial of Discharge).

range set forth in the PSR (292 to 365 months).  The top of each range, however, is the ten year statutory maximum sentence.

Under Section 3553(a), a ten year sentence is reasonable, fair and reflects the seriousness of the offenses.  Although Hecker pled guilty to two counts, he committed multiple acts of fraud over a period of years, continued his crimes even after being caught, and committed new crimes even after being indicted in this very case. Hecker was the leader and mastermind of all of these crimes, and he victimized numerous associates by corrupting them and recruiting them to assist in his crimes.  He committed his crimes in all instances as a means of financing his excessive lifestyle, to the detriment of others, including employees who went weeks without pay and ultimately lost their job due in large part to his crimes.

Second, a ten year sentence is necessary to promote respect for the law, provide just punishment, and afford adequate deterrence.  This is a defendant who throughout the entire duration of this case has behaved as if the rules of this Court and the bankruptcy court do not apply to him.  He blatantly violated not only court orders but also federal law.  He has looked not one but two federal judges in the face and has lied to them.

Members of the public rightly wondered time and again how Hecker was able to "get away" with gaming the system on so many occasions.  In this case, as well as in the bankruptcy proceeding, Hecker did not get away with it, and a strong sentence will

reinforce that message.  A sentence of ten years will go a long way toward deterring him from ever attempting to game the system again, and should deter others from engaging in similar crimes. Particularly with respect to his bankruptcy fraud, the sentence in this case will emphasize that those who seek the protection of bankruptcy must abide by the rules of that process, but if they choose not to, their punishment will be severe.

Finally, the history and characteristics of this defendant fully support a ten year sentence.  Hecker is 58 years old.  He will be in his late 60s when he is released from prison.  Hecker's fall from grace has been dramatic, but it is one he caused entirely himself.  Hecker had the talent and the good fortune to earn a tremendous living in an honest way.  That was not enough.  Even when given opportunities and privileges, whether in business or in this case, Hecker chose to squander those privileges.  He chose to put his own financial interests above all else, including the rule of law and our system of justice.

Hecker deserves a ten year sentence for all he had done.  The public deserves a ten year sentence to be protected from Hecker's further crimes.

## **CONCLUSION**

For all these reasons, the United States respectfully requests a sentence of ten years imprisonment, along with an order of restitution for each of his victims, including Chrysler Financial,

46

Hyundai Capital, American State Bank and Trust, U.S. Bank, North Shore Bank, Center National Bank, and the bankruptcy estate, in at least the amounts set forth in the PSR.


Dated: January 13, 2011          Respectfully submitted,

                                 B. TODD JONES
                                 United States Attorney

                                 s/Nicole A. Engisch

                                 BY: NICOLE A. ENGISCH
                                     NANCY E. BRASEL
                                     DAVID M. GENRICH
                                 Assistant United States Attorneys